MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2016 ME 136
Docket:        BCD-15-103
Argued:        December 8, 2015
Decided:       August 16, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

DONALD PETRIN et al.

v.

TOWN OF SCARBOROUGH

HJELM, J.

[¶1]  In 2012, the Town of Scarborough reassessed the tax valuation of parcels of land located in several areas within the Town, including the Pine Point, Higgins Beach, and Pillsbury Shores neighborhoods. Donald Petrin and other plaintiffs[1] (collectively, the Taxpayers) own parcels of land in those

---

   [1] The appellants are Donald Petrin, Philip Lebel, Robert and Roberta Mulazzi, Patricia and Luke Brassard, Robert and Michele Demkowicz, Gerald and Judith Gaudette, Jeffrey Fink, Dave and Robin Provencher, Albert and Marcia Hunker, Robert and Tookie Clifford, Richard and Judith Mushial, Robyn Fink, Kathy Tito, Gregory Campbell, Carolyn and Norman Brackett, Glorian and George Yerid, Joanne and Bill Mahoney, Jack Shapiro, Paul and Louise Houde, Daniel and Lori McKeown, Robert and Linda Voskian, Irene Shevenell, William and Joann Browning, Richard and Julie Mullen, Vince and Barbara Bombaci, Thomas Curley, Alyson Bristol, John Haskell, Koni Jaworski, Paul and Priscilla Reising, Preston Leavitt, Jeffrey and Jennifer Seaver, Diane and Robert Gayton, and Claire Fitzpatric.

   The record reveals some confusion about the status of two of the plaintiffs.  First, according to the complaint, plaintiff Koni Jaworski owns Lot 32 on Tax Map U002.  The abatement application associated with that parcel was filed under a different named owner, whose name also appears as the owner on the tax card for that parcel.  That person is not a named plaintiff.  Second, the complaint alleges that plaintiff John Haskell owns Lot 80 on Tax Map U001 and that he sought an abatement for that parcel.  The tax card for that parcel, however, identifies a different person as the owner.  The record indicates that John Haskell applied for an abatement for a different parcel—Lot 138 on Tax Map U002—but that the assessment for that parcel *decreased* as a result of the

2

neighborhoods. As a result of the partial revaluation, the municipal assessments of their parcels of land increased. The Taxpayers unsuccessfully sought abatements from the Town Assessor and the Scarborough Board of Assessment Review. The Taxpayers now appeal from a judgment entered in the Business and Consumer Docket (*Horton, J.*) concluding that they do not have standing to assert one of their challenges but otherwise affirming the Board's decision.

[¶2] We conclude that the Taxpayers have standing to pursue all of their challenges. We also determine that one of the Town's assessment practices is contrary to Maine law and that the Board erred by concluding that the unlawful practice did not result in discriminatory assessments of the Taxpayers' properties. We therefore remand to the Business and Consumer Docket with instructions to remand to the Board for further proceedings.

I. BACKGROUND

[¶3] The Town of Scarborough last conducted a town-wide valuation of the approximately 8,500 parcels of land located within the Town in 2005. As the Board found, however, on an ongoing basis the Town Assessor monitors sales of Scarborough property and conducts annual studies to ensure that,

2012 partial revaluation that is at issue in this case. These issues do not affect our overall analysis and are better addressed by the Scarborough Board of Assessment Review on remand.

based on those sales, real estate assessments comply with applicable legal requirements. In 2012, Town Assessor Paul Lesperance revalued properties in certain neighborhoods based on his ongoing analysis of sales data. This partial revaluation resulted in decreased assessments for 475 properties but increased assessments for 279 properties, including properties owned by the Taxpayers. Specifically, assessments of waterfront properties in Higgins Beach and Pine Point increased by 20% and 25%, respectively, and assessments of interior, water-influenced properties[2] in Pillsbury Shores increased by 17%.

[¶4] In early 2013, the Taxpayers filed separate applications with Lesperance requesting abatements for the 2012 tax year pursuant to 36 M.R.S. § 841(1) (2015). In their applications, the Taxpayers alleged that the partial revaluation resulted in unjustly discriminatory assessments of their properties. Lesperance denied the applications, and the Taxpayers appealed to the Scarborough Board of Assessment Review pursuant to

---

[2] As Lesperance's testimony establishes, and the parties appear to agree, a "water-influenced" property is one that is located in close proximity to—but does not directly border—a body of water. *See generally* 4 C.M.R. 18 125 201-1 § 1(AA) (2015) (defining "waterfront property" to include property "bounded by a body of water or waterway" and property "whose value is measurably *influenced* by its access or proximity to the water" (emphasis added)).

4

36 M.R.S. § 843(1) (2015).[3] After granting the Taxpayers' request to consolidate the appeals, the Board held a hearing on three dates in August through October of 2013.

[¶5] The testimony and evidence presented at the hearing focused on two topics: (1) the basis for the 2012 partial revaluation, and (2) assessment practices affecting the Town's valuation of large lots and contiguous lots held in common ownership. Because we conclude that the Board erred in its analysis of municipal valuations of contiguous lots held in common ownership, we focus our outline of the evidence on that point.

[¶6] At the hearing before the Board, Lesperance testified about an assessment methodology for valuing lots larger than one acre, and another methodology for valuing adjacent lots held in common ownership. Although during the Board proceedings the parties referenced these practices in an undifferentiated way as the "excess land program," they are actually two different practices.

[¶7] As to the first practice—in effect, a "large lot" program— Lesperance explained that when assessing parcels that are larger than one acre, the Town recognizes the diminishing value of land in "excess" of its base

---

[3] Owners of a total of forty-three parcels filed applications with the Board. Of those taxpayers, the owners of thirty-five parcels pursue their challenges on this appeal.

lot. *See* 4 C.M.R. 18 125 201-1 § 1(D) (2015) (defining "base lot" as "a parcel of land . . . which meets municipal guidelines for development"). The base lot is a portion of the overall lot and is assigned a specific value depending on the zoning district in which the lot is located. The area in excess of the base lot is then assigned a diminishing value pursuant to a curve. The effect is that the value assigned to the excess land within a single parcel—that is, the land in excess of the base lot—is less than the value that excess land would have if it were assessed at the same valuation rate used for the base lot. Lesperance testified that the Town applies this valuation method to large parcels that could be divided into smaller lots, in part because lots are not valued based on their development potential.

[¶8] In contrast to the practice that affects the assessment of single parcels larger than one acre, Lesperance testified about an "abutting property benefit" that is also available to property owners, but only upon their request. Under that practice, two separate but abutting parcels in common ownership are treated as a single parcel for assessment purposes. Based on the same general principle of diminishing property value that underlies the large lot program, the overall tax assessment for abutting parcels is less than it would be if the parcels were assessed separately. Lesperance testified, as an

illustration, that if each parcel is one-half acre and the owner requests the abutting property benefit, the Town values the combined parcels as if they were a one-acre base lot, resulting in a lower overall tax assessment. Lesperance also testified about a specific example where the first of two abutting lots is one acre. He stated that if the second parcel—which he characterized as "excess land"—were assessed separately, "the valuation would be much higher." In both circumstances, therefore, the abutting property program results—as Lesperance testified—in a "tax savings" to the owner of the abutting lots.

[¶9] Lesperance stated that there were twenty or thirty sets of parcels in Scarborough that benefitted from the abutting property program, mostly located in the Prouts Neck neighborhood. The evidence also establishes that with the exception of one of the Taxpayers, Preston Leavitt, who owns at least two abutting parcels, all of the Taxpayers own single parcels.[4] None of the Taxpayers owns a parcel larger than one acre.

[¶10] In a written decision issued in December 2013, the Board denied the Taxpayers' consolidated appeals. The Board found, inter alia, that

---

[4] The record does not appear to reveal whether Leavitt receives the favorable tax treatment, available only upon request, that arises from the abutting property program. On remand, the Board will need to address how our holding affects Leavitt's standing to challenge that practice. The uncertainty regarding Leavitt's particular situation, however, does not affect our overall analysis.

Lesperance's "appraisal techniques were thorough and well-grounded in expert assessing methodology," that he "did not use systematic or intentional methods to create a disparity in valuations" or rely on "unfounded or arbitrary" assumptions, and that any errors in the analysis "did not affect the overall equity of the assessments." The Board further stated that its "primary concern [about the abutting property program] was that the second lot reduction must be requested and that this policy may not be widely known in town." Nevertheless, the Board "concluded that the actual impact of this policy was minor and did not make the assessments discriminatory."

[¶11] In January 2014, pursuant to 36 M.R.S. § 843(1) and M.R. Civ. P. 80B, the Taxpayers appealed the Board's decision in a complaint filed in the Superior Court (Cumberland County). On application by the Taxpayers, the case was transferred to the Business and Consumer Docket. In its ensuing judgment, the court concluded that the Taxpayers did not have standing to seek remedial relief based on the methods used by the Town to assess large single parcels and abutting parcels in common ownership because the Town uses those methods uniformly and so the Taxpayers' properties were not treated differently than the properties of other taxpayers. On the merits of the remaining challenges, the court affirmed the Board's decision to deny the

abatement applications. The Taxpayers appealed pursuant to 5 M.R.S. § 11008(1) (2015).

## II. DISCUSSION

[¶12] The Taxpayers argue that the evidence in the record compelled the Board to find that they bear an unequal share of the Town's overall tax burden because (1) the Town's assessment practices affecting large parcels and abutting parcels in common ownership create a discriminatory effect unfavorable to them,[5] and (2) the 2012 partial revaluation was based on flawed data and arbitrarily targeted certain waterfront and water-influenced neighborhoods.

[¶13] When the trial court acts as an appellate tribunal in reviewing a decision of a municipal Board of Assessment Review,

> we review the Board's decision directly for abuse of discretion, errors of law, and sufficient evidence. That the record contains evidence inconsistent with the result, or that inconsistent conclusions could be drawn from the evidence, does not render the Board's findings invalid if a reasonable mind might accept the relevant evidence as adequate to support the Board's conclusion.

*Terfloth v. Town of Scarborough*, 2014 ME 57, ¶ 10, 90 A.3d 1131 (citation omitted) (quotation marks omitted).

---

[5] Although the Board's decision explicitly addressed only the benefit offered to the owners of contiguous lots, the Board's general acceptance of the Assessor's appraisal techniques constitutes at least an implied finding that the assessment practice applicable to large single lots was proper.

[¶14] "A town's tax assessment is presumed to be valid." *Ram's Head Partners, LLC v. Town of Cape Elizabeth*, 2003 ME 131, ¶ 9, 834 A.2d 916. To rebut this presumption, a taxpayer bears an affirmative burden of proving that the assessed value of the property is "manifestly wrong" by demonstrating "(1) that [the] property was substantially overvalued and an injustice resulted from the overvaluation; (2) that there was unjust discrimination in the valuation of the property; or (3) that the assessment was fraudulent, dishonest, or illegal." *Terfloth*, 2014 ME 57, ¶ 12, 90 A.3d 1131 (quotation marks omitted). Here, the Taxpayers argue only that there was unjust discrimination in the valuation of their properties.

[¶15] The prohibition against unjust discrimination in property taxation derives from article IX, section 8 of the Maine Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Ram's Head*, 2003 ME 131, ¶ 9, 834 A.2d 916. Article IX, section 8 provides that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." To satisfy this requirement, a municipality must ensure, first, that each property is assessed at "just value," which is equivalent to "market value," *Weekley v. Town of Scarborough*, 676 A.2d 932, 934

(Me. 1996) (quotation marks omitted), and, second, that the tax burden is "apportioned and assessed equally" in order to prevent unjust discrimination between or among taxpayers, Me. Const. art. IX, § 8; *see also Terfloth*, 2014 ME 57, ¶ 11, 90 A.3d 1131. To achieve an equitable distribution of the overall tax burden, assessors must apply a "relatively uniform rate" to all "comparable propert[ies] in the district." *Terfloth*, 2014 ME 57, ¶ 11, 90 A.3d 1131 (quotation marks omitted).

[¶16] Here, to prevail on their claim of unjust discrimination, the Taxpayers had the burden of proving to the Board "that the assessor's system necessarily results in unequal apportionment." *Ram's Head*, 2003 ME 131, ¶ 10, 834 A.2d 916 (quotation marks omitted). Because the Board concluded that the Taxpayers failed to meet that burden, we will vacate the Board's decision "only if the record compels a contrary conclusion to the exclusion of any other inference." *Terfloth*, 2014 ME 57, ¶ 13, 90 A.3d 1131 (quotation marks omitted).

[¶17] We first consider the Taxpayers' claim of unjust discrimination based on the Town's assessment practices affecting commonly-owned contiguous lots (the "abutting property" program), which implicates the

question of standing. We then address the Taxpayers' remaining challenges, which are directed at the large lot program and the 2012 partial revaluation.

A.    Abutting Property Program

[¶18]  The Taxpayers argue that the court erred by concluding that they lack standing to challenge the abutting property program. They go on to contend that on the merits, the Board erred by concluding that the practice is constitutional and not unjustly discriminatory. For the reasons set out below, we conclude that the Taxpayers have standing and that the program necessarily results in an unequal apportionment of the municipal tax burden, which operates to the Taxpayers' detriment.

1.    Standing

[¶19]  The Taxpayers assert that because their properties did not receive the favorable tax treatment granted to owners of abutting parcels who requested the benefit, they have suffered a particularized injury and thus have standing to challenge that practice. Conversely, the Town argues that the Taxpayers do not have standing because they have not suffered any harm that is different from the harm experienced by all other taxpayers in Scarborough. Whether a party has standing is a question of law that we review de novo. *Friends of Lincoln Lakes v. Town of Lincoln*, 2010 ME 78, ¶ 8, 2 A.3d 284.

[¶20]  When a taxpayer seeks *remedial* relief from a municipality's use of a practice that allegedly results in an unlawful assessment, the taxpayer is "required to show special or particularized injury: injury different from that incurred by every other taxpayer."  *Lehigh v. Pittston Co.*, 456 A.2d 355, 358 (Me. 1983).  In contrast, a request for *preventative* relief, such as an injunction, requires no such showing.  *See Buck v. Town of Yarmouth*, 402 A.2d 860, 861-62 (Me. 1979).  Here, the Taxpayers do not seek to enjoin the Town from favoring the owners of large or contiguous lots.  Rather, they seek only remedial relief for the Town's past use of practices that affected their 2012 property tax assessments.  Accordingly, the Taxpayers must demonstrate a particularized injury.

[¶21]  The Taxpayers meet this requirement because the abutting property program does not affect all properties in the same way.  The challenged practice results in differing tax treatment for two types of parcels: parcels that are given a discounted assessed value, with a resulting tax benefit to the owners of those parcels; and parcels that are assessed at full value, which deprives those parcels' owners of the lower assessment.  To qualify for the discounted assessment rate, a parcel must abut another parcel in common ownership.  For purposes of municipal tax assessments, an abutting parcel

therefore is assessed at a different—and lower—rate than other comparable parcels. Because the Taxpayers own properties that do not receive the comparatively favorable tax treatment that is conferred on abutting parcels, the Taxpayers have a "particular right to be pursued or protected," *Buck*, 402 A.2d at 861 (quotation marks omitted)—that is, their right to have their properties taxed equitably in relation to the abutting properties, *see Ram's Head*, 2003 ME 131, ¶ 10, 834 A.2d 916; *Knight v. Thomas*, 93 Me. 494, 500, 45 A. 499 (1900) (stating that a taxpayer has standing, based on a "personal interest," to challenge a municipal tax assessment that results in an unequal allocation of the tax burden). The Taxpayers have demonstrated a particularized injury and as a matter of law have standing to challenge the abutting property program.[6]

[¶22] We now address the merits of the Taxpayers' challenge to the Town's assessment of commonly-owned abutting parcels.

---

[6] The Taxpayers also argue that the court erred by concluding that they lack standing to challenge the other arm of the excess land program—the large lot program—which affects the Town's valuation of lots larger than one acre. For the same reasons that establish the Taxpayers' standing to challenge the abutting property program, the Taxpayers have standing to challenge the large lot program, because it results in an overall lower assessment rate applicable to large lots, compared to the overall rate that applies to smaller lots.

## 2. Unjust Discrimination

[¶23] The Taxpayers argue that the abutting property program is unconstitutional on its face and that the Board erred by concluding that it did not have a discriminatory effect adverse to their interests. This argument requires us to determine whether the Taxpayers have demonstrated that the Board was compelled to conclude that the program necessarily resulted in a discriminatory apportionment of the municipal tax burden. *See Ram's Head*, 2003 ME 131, ¶ 10, 834 A.2d 916. We conclude that the Taxpayers have met that burden.

[¶24] The prohibition against discriminatory tax assessments, which is rooted in the constitutional principle of equal protection, "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Hillsborough v. Cromwell*, 326 U.S. 620, 623 (1946). The taxing authority is therefore constitutionally required to achieve "a rough equality in tax treatment of similarly situated property owners," thereby treating those property owners "evenhandedly." *Allegheny Pittsburgh Coal Co. v. Cty. Comm'n*, 488 U.S. 336, 343, 345 (1989), *quoted in Ram's Head*, 2003 ME 131, ¶ 10, 834 A.2d 916. Although a municipality is entitled to create various

classes of property and impose different tax burdens on those respective classes, "those divisions and burdens [must be] reasonable," based on the character of the properties or on policy. *Allegheny*, 488 U.S. at 344.

[¶25]  In *Ram's Head*, we recognized that "[m]ost property tax discrimination cases involve a defined methodology that results in unequal treatment" of properties within the same class.  2003 ME 131, ¶ 13, 834 A.2d 916; *see also Allegheny*, 488 U.S. at 345 (holding that a state may not engage in "intentional systematic undervaluation" of property (quotation marks omitted)).  Additionally, we held that to demonstrate a discriminatory effect of a challenged assessment practice, taxpayers need not present evidence of the actual value of the parcels that allegedly receive favorable treatment.  *Ram's Head*, 2003 ME 131, ¶ 12, 834 A.2d 916.  Rather, taxpayers may establish discrimination with proof that parcels owned by other taxpayers "are assessed at drastically lower valuations; that there are no distinctions between the [two sets of] properties that justify the disparity; and that any rationale offered by the Town for the lower valuation[s] is unfounded or arbitrary." *Id.*

[¶26]  Here, the Town uses a valuation methodology by which the assessor intentionally and systematically discounts the assessed value of

abutting lots in common ownership for the sole reason that there is a common boundary between the two. Lesperance's testimony establishes that the abutting property program is an outgrowth of the way the Town assesses a *single* parcel that is larger than one acre so that the value of the parcel that exceeds the base lot carries less value than the base lot itself. As we discuss below, *see infra* ¶ 36, the Board was entitled to conclude that *when applied to single lots*, the assessment practice was proper. With the abutting property program, however, the Town treats *separate* but abutting lots as if they were a single parcel, resulting in an artificially low overall assessment. The Town's application of the large-lot assessment methodology to abutting parcels is necessarily untenable because it violates Maine law in two ways.

[¶27] First, this practice violates the statutory requirement that each parcel of real estate must be assessed separately. *See* 36 M.R.S. § 708 (2015) (stating that for each tax year, the assessor "shall estimate and record *separately* the land value, exclusive of buildings, of *each parcel of real estate*" (emphasis added)). We have explained that in implementing this requirement, "tax assessors have a reasonable degree of discretion in determining where individual parcels exist," considering all of the circumstances. *City of Augusta v. Allen*, 438 A.2d 472, 476-77 (Me. 1981). The

measure of discretion, however, does not mitigate a municipality's obligation under the law to treat "separate and distinct real estates belong[ing] to the same owner . . . as distinct subjects of taxation . . . [that] must be separately valued and assessed." *McCarty v. Greenlawn Cemetery Ass'n*, 158 Me. 388, 393-94, 185 A.2d 127 (1962) (quotation marks omitted). This requirement satisfies section 708 and preserves a taxpayer's right to redeem each lot separately. *See id.* at 393-94. The Town's practice of undervaluing abutting lots therefore violates the requirement, established in Maine law, of separate assessments.[7]

[¶28] Second, the abutting property program violates the constitutional requirement that real estate be assessed at *just value*. *See* Me. Const. art. IX, § 8. As Lesperance explained, when a property owner asks the Town to apply the abutting property program, the owner receives a "tax savings." This point

---

[7] As the Town correctly notes, an assessor is authorized to combine contiguous lots for purposes of assessment, but only when three conditions exist. Specifically, 36 M.R.S. § 701-A (2015) provides that

> [f]or the purpose of establishing the valuation of unimproved acreage in excess of an improved house lot, contiguous parcels . . . may be valued as one parcel when: each parcel is 5 or more acres; the owner gives written consent to the assessor to value the parcels as one parcel; *and* the owner certifies that the parcels are not held for sale and are not subdivision lots.

(Emphasis added.) Therefore, by its plain terms, section 701-A applies only when, inter alia, "each parcel is 5 or more acres." *Id.* The provision therefore does not allow the Town to apply its abutting lot program when either parcel is smaller than five acres.

is demonstrated by the evidence presented to the Board of examples where commonly-owned abutting lots are undervalued. In one of those examples, Lesperance assessed a one-acre parcel at nearly $1.8 million, and an abutting 1.27-acre parcel at only $12,700, even though that abutting parcel was "buildable" and could be developed. Lesperance testified that these separate parcels were "treated as one parcel for assessment purposes"; that the owner was "benefiting" from that treatment; and that if the abutting lot were assessed separately, "the valuation would be much higher." Lesperance's testimony therefore allows no conclusion other than that the abutting parcel was given a discounted assessed value solely because of the abutting property program and not because of any feature or quality of the parcel affecting its just value. Maine law does not permit the Town to engage in the fiction of treating *separate* smaller abutting lots as if they were a single larger lot, which results in an assessment that does not reflect just value.

[¶29] Because each parcel of real estate must be assessed separately and according to just value, regardless of whether the parcel abuts another parcel in common ownership, the Town's rationale for the abutting property program is not reasonable, *see Allegheny*, 488 U.S. at 344, and cannot serve as the basis for the Town's assessments.

[¶30]  Having concluded that the Town failed to present a rationale for the abutting property program that is reasonable and consistent with Maine law, we turn to the dispositive question of whether the Board was compelled to find that the practice necessarily results in unequal tax treatment.

[¶31]  Lesperance testified that there are twenty to thirty taxpayers who receive favorable tax treatment in the form of a "tax savings" as a result of the abutting property program.  This necessarily means that those who do not own abutting lots are subjected to taxes that are not imposed on owners of lots that happen to be abutting.  This contravenes the Taxpayers' rights of equal protection.  *See Hillsborough*, 326 U.S. at 623; *Ram's Head*, 2003 ME 131, ¶ 10, 834 A.2d 916 (stating that the "constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners" (quotation marks omitted)).

[¶32]  Arguing—as the Board found—that the undervaluation of the abutting lots does not result in a discriminatory apportionment of the municipal tax burden, the Town points to evidence of the relatively small number of taxpayers who receive favorable tax treatment under the abutting property program, relative to the 8,500 parcels located in Scarborough with a total assessed valuation of approximately $3.5 billion.  The Town's position,

however, rests on the incorrect notion that the proper remedy for unjust discrimination is an upward revision of the taxes for the properties that received favorable treatment in 2012. Instead, as is established in a longstanding constitutional doctrine, "*abatement* is the proper remedy for unjust discrimination." *Ram's Head*, 2003 ME 131, ¶ 15, 834 A.2d 916 (emphasis added) (collecting cases). Therefore, regardless of what *future* effect a proper assessment of abutting properties may have on the apportionment of tax burden among *all* of the Town's property owners, the evidence compelled the Board to conclude that the Taxpayers' properties were assessed in a systematically discriminatory manner and that the Taxpayers are entitled to an abatement for the 2012 tax year. We must therefore remand this matter to the Business and Consumer Docket with instructions to remand to the Board for further proceedings to address the inequality in tax treatment affecting the Taxpayers because of the abutting property program.

B.      Taxpayers' Remaining Challenges

[¶33]  Although we remand this matter for the Board to address the unlawfully discriminatory effect of the Town's abutting property program, we

address the Taxpayers' remaining challenges so that the nature and scope of the municipal proceedings on remand are clear.

[¶34]   In their remaining arguments, the Taxpayers contend that, as with the abutting property program, the Town's assessments of single lots that are larger than one acre result in unequal apportionment, and that the 2012 partial revaluation improperly targeted their properties.  We address these arguments in turn, ultimately finding each to be unpersuasive.

1.    Large Lot Program

[¶35]   The Taxpayers contend that the Town has used an unfairly discriminatory valuation practice by assessing portions of larger single lots at a rate that is lower than the rate applied to the "base" portion of the lots.

[¶36]    So long as an assessment "represents a fair and just determination of value" for the parcel "as a whole," no constitutional harm has occurred.  *Roberts v. Town of Southwest Harbor*, 2004 ME 132, ¶ 4, 861 A.2d 617 (quotation marks omitted) (holding that a taxpayer failed to satisfy his burden of proving unjust discrimination when his argument "focused only on a component of his assessed value . . . and not on the total assessed value").  Here, Lesperance's testimony entitled the Board to find that in assessing the fair market value of a single parcel that consists of a base lot

and additional unimproved land, that additional land contributes in diminishing degrees to the overall market value of the parcel. Notwithstanding a conflicting view expressed by the Taxpayers' expert, the Board was entitled to find that the Town's assessment of an individual parcel larger than one acre "represents a fair and just determination of value" when considering the parcel "as a whole." *See id.* (quotation marks omitted). Therefore, the Board was not compelled to conclude that the large lot program is unjustly discriminatory.

2.    Partial Revaluation

[¶37] The Taxpayers next argue that the evidence compelled the Board to find that the 2012 partial revaluation failed to equalize the apportionment of taxes within the Town because there was insufficient evidence to show that the assessment-to-sales ratios in the targeted waterfront and water-influenced neighborhoods were significantly different from those in other residential areas.[8]

---

[8]    The Taxpayers also argue that because Lesperance increased the valuations for their waterfront properties in Higgins Beach and Pine Point, but did not impose the same valuation increases on other waterfront properties in those neighborhoods, the Taxpayers' properties were unfairly targeted for unequal treatment. This argument is not persuasive. As Lesperance testified, he focused only on the specific markets where there were meaningful sales data demonstrating a divergence between the assessment-to-sales ratios in those markets and the residential average, and accordingly excluded riverfront areas within Higgins Beach and Pine Point where pricing trends did not indicate a disparity. Lesperance also explained that he excluded a limited number of

[¶38] As we have previously held, although "[t]ownwide revaluations are perhaps the best method of maintaining equal apportionment of the tax burden[,] . . . assessors are not precluded from" adjusting assessments for selected properties "between townwide revaluations" if such adjustments will achieve greater equality. *Moser v. Town of Phippsburg*, 553 A.2d 1249, 1250 (Me. 1989). Further, an assessor need not attain absolute equality when revaluing properties; rather, only "rough equality" is required. *Id.* (quotation marks omitted).

[¶39] The evidence, viewed as a whole, supports the Board's conclusion that the partial revaluation improved the equity of the Town's assessments. Lesperance testified that in 2011, the average assessment-to-sales ratio in residential areas of the Town was close to 100%. That ratio is also set out in

---

waterfront properties in Higgins Beach from the revaluation because they possessed physical characteristics that made them unsuitable for development.

In addition to challenging the partial revaluation, the Taxpayers make a broader argument that the Town's assessments of residential properties are consistently closer to market value than its assessments of waterfront and water-influenced properties, demonstrating an inequitable distribution of the Town's overall tax burden. Our review, however, is limited to the effect of the Town's assessment practices on the *Taxpayers'* properties. We therefore do not consider the effect of those practices on waterfront and water-influenced properties generally. Moreover, as discussed *infra* ¶¶ 39-44, the evidence was sufficient to support the Board's conclusion that the Assessor's methodologies resulted in assessments that were both closer to fair market value and more equitable relative to the average assessment-to-sales ratio for residential properties in the Town.

24

the portions of the annual State Valuation Reports[9] prepared by Maine Revenue Services (MRS)[10] that address municipal tax assessments in Scarborough in the 2011 tax year. In contrast, the Board received evidence that for the specific waterfront and water-influenced markets that Lesperance reassessed in 2012, the assessment-to-sales ratios were significantly *below* that standard.[11] Lesperance stated that the valuation increases resulting from the 2012 partial revaluation directly addressed those disparities, improving the assessment ratios for the targeted areas in Higgins Beach, Pine Point, and Pillsbury Shores so that they were closer to 100%, and bringing them in line with the residential average. The post-valuation assessment ratios were also well within statutory "minimum assessing standards" that are designed to achieve just and equitable property tax assessments, 36 M.R.S. §§ 326-327

[9] The "State Valuation" is "the annual list of the equalized and adjusted value of all taxable property in each municipality as of April 1, two years prior." 4 C.M.R. 18 125 201-1 § 1(W) (2015). The MRS conducts the valuations to determine whether municipalities are in compliance with the minimum assessing standards and constitutional requirements. *See* 36 M.R.S. § 305(1) (2015) (stating that the MRS must annually file a "valuation" with the Secretary of State certifying that "the equalized just value of all real and personal property in each municipality" is "uniformly assessed" and "based on 100% of the current market value"); *see also* 36 M.R.S. §§ 329, 383(1) (2015).

[10] "Maine Revenue Services," which is the term used in the record on this appeal, is referred to in some statutes as the "Bureau of Revenue Services." *See* 36 M.R.S. § 111(1-B) (2015).

[11] As the Taxpayers correctly assert, the State Valuation Reports introduced in evidence show little divergence between assessment-to-sales ratios in the overall "residential" and "waterfront" categories. As Lesperance explained in his testimony, however, the "waterfront" category in those reports includes *all* waterfront and water-influenced properties in the Town. Conversely, Lesperance's post-valuation sales ratio studies focus only on particular waterfront and water-influenced markets, and demonstrate that, on average, sales prices in those discrete areas significantly exceeded assessments.

(2015), which require municipalities to maintain town-wide assessment-to-sales ratios of 70% to 110%, *id.* § 327(1).

[¶40] Lesperance also stated that he reduced assessments in other neighborhoods where the sales data established a trend of lower sales prices. The 2012 revaluation therefore targeted locations that constitute "separate markets" and adjusted the assessments there in order to equalize assessment-to-sales ratios throughout the Town.

[¶41] Post-valuation studies also examined the "quality ratings" of the revalued properties. A "quality rating" measures the variance between particular sales prices and the average assessment-to-sales ratio. A lower quality rating indicates a lower divergence and therefore a more equitable assessment. Municipalities are required to maintain quality ratings of no more than 20. 36 M.R.S. § 327(2). As a result of the revaluation, the quality rating for two of the three neighborhoods improved, decreasing from 14 to 11 for Pine Point, and from 9 to 7 for Pillsbury Shores. In the third neighborhood, Higgins Beach, the quality rating remained at 6. Additionally, MRS's independent audit of the 2012 partial revaluation, *see* 36 M.R.S. § 384 (2015), further confirmed that the revaluation resulted in "a decisive improvement in

[the] equity and assessment levels" of the targeted properties in comparison to properties in other parts of Town.

[¶42] The Taxpayers argue that the Board erred by relying on Lesperance's post-valuation studies as evidence that the revaluation improved the equity of the Town's assessments, because those studies include sales that took place before the economic downturn of 2008. They contend that when there is a significant change in the market, such as a recession, it is improper for an assessor to consider sales that took place before that event. Contrary to their contention, however, the Board received competent evidence to support its implicit findings that the 2008 recession did not have a significant adverse impact on waterfront property values in Scarborough and that therefore the inclusion of pre-2008 data in Lesperance's studies was proper. Although the Taxpayers presented testimony from an appraiser who offered a contrary opinion regarding the effect of the 2008 recession, the Board was not compelled to accept that view. *See Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 14, 750 A.2d 577 (explaining that a municipal board is entitled to make credibility determinations and find facts based on its assessment of the evidence).

[¶43]  Additionally, contrary to the Taxpayers' contention, Lesperance's reliance on sales occurring since the last town-wide revaluation is consistent with our analysis in *Opinion of the Justices*, 2004 ME 54, 850 A.2d 1145.  In that case, we considered the constitutionality of proposed legislation that would have created two different bases for tax value purposes depending on the date of acquisition.  *Id.* ¶ 13.  We concluded that the proposed bill "[ran] afoul of the [constitutional] requirement that a valid property tax must be based on [current] market value," because some properties would be taxed based entirely on an assessment from eight years earlier.  *Id.* ¶ 16; *see also* Me. Const. art. IX, § 8.  Here, Lesperance did not arbitrarily adopt assessed values from a prior tax year as the exclusive basis for the revaluation.  Rather, he considered a mix of sales occurring between the last town-wide revaluation and the beginning of the 2012 tax year.  He explained that by considering sales from a range of years he was able to confirm a market trend, thereby improving the accuracy of his assessments.   The Board was entitled to conclude that this assessment methodology was proper and resulted in a reasonable approximation of the 2012 market value for the properties.  *See Opinion of the Justices*, 2004 ME 54, ¶ 16 & n.7, 850 A.2d 1145 (citing *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 390 (Me. 1981)) (noting that

local assessors have "flexibility" to choose an appropriate methodology to determine market value).

[¶44]  We therefore conclude that, contrary to the Taxpayers' contentions, the Board did not err by determining that the Assessor reasonably increased assessments for targeted waterfront and water-influenced properties in Higgins Beach, Pine Point, and Pillsbury Shores in 2012, and that Lesperance's use of market data was not flawed.

## III.  CONCLUSION

[¶45]  Although the Board did not err in denying the Taxpayers' abatement applications based on several of their contentions, the evidence compels the conclusion that the Town's method of assessing separate but abutting parcels held in common ownership resulted in unequal apportionment because that methodology necessarily deprives the Taxpayers "of a rough equality in tax treatment of similarly situated property owners." *Allegheny*, 488 U.S. at 343.  We therefore remand this action to the Business and Consumer Docket with instructions to remand to the Board for a determination of the appropriate abatements.

The entry is:

> Judgment vacated. Remanded to the Business and Consumer Docket with instructions to remand to the Scarborough Board of Assessment Review for further proceedings consistent with this opinion.

---

**On the briefs:**

John B. Shumadine, Esq., Murray, Plumb & Murray, Portland, for appellants Donald Petrin et al.

Robert J. Crawford, Esq., and N. Joel Moser, Esq., Bernstein Shur, Portland, for appellee Town of Scarborough

**At oral argument:**

John B. Shumadine, Esq., for appellants Donald Petrin et al.

Michael A. Hodgins, Esq., Bernstein Shur, Augusta, for appellee Town of Scarborough

Business and Consumer Docket docket number AP-2014-03
FOR CLERK REFERENCE ONLY